UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID FLAHERTY, JANE WENSLEY      )
AND DAVID COSTA,                  )
    Plaintiffs                )
                                  )
                v.       ) C.A. NO. 12-CV-30055-MAP
                                  )
DANIEL KNAPIK,                    )
    Defendant                 )


MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 20 & 30)

February 21, 2014

PONSOR, U.S.D.J.

## I. INTRODUCTION

Plaintiffs David Flaherty, a city councilor; Jane
Wensley, a local government official; and David Costa, a
politically active land owner, all reside in the city of
Westfield, Massachusetts.  Defendant, Daniel Knapik, is the
Mayor of Westfield.  Plaintiffs have brought this five-count
action asserting violations by Knapik of their right to free
expression under federal and state law.  Their complaint
also includes claims for common-law trespass and conversion.
The parties have filed cross-motions for summary judgment.
(Dkt Nos. 20 & 30.)

The dispute centers on Mayor Knapik's order on November 7, 2011 to Westfield employees to remove certain political signs in the vicinity of East Silver Street and Lindbergh Boulevard near his home, on the ground that they were creating an unsafe condition by interfering with the sight lines at an intersection.  Plaintiffs contend that the safety issue was a pretext; they say Knapik ordered the removal because the signs supported political rivals.  As evidence, they point to the undisputed fact that Knapik ordered the removal only of the political signs and allowed a commercial sign to stay.

It is clear from the undisputed facts that Defendant Knapik's removal of the signs -- whatever his actual intent -- constituted a content-based restriction of free speech. Applying the strict scrutiny analysis applicable to content-based restrictions on expression in public forums, the court must conclude that Plaintiffs are entitled to summary judgment on their federal claim for violation of their First Amendment rights and on their parallel claim under the Massachusetts Declaration of Rights.  They have failed, however, to show the use of threats, intimidation, or

-2-

coercion, and thus Defendant is entitled to summary judgment on Plaintiffs' claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I.  Defendant is also entitled to summary judgment on Plaintiffs' conversion claim, as Plaintiffs have not shown a genuine dispute of material fact on the issue of damages.

Finally, since a disputed issue of fact exists regarding the ownership of the tree belt where the signs were placed and then removed, summary judgment for either party on Plaintiffs' trespass claim is inappropriate.

In sum, for the reasons set forth in more detail below, the court will allow Plaintiffs' motion for summary judgment on their federal and state constitutional claims (Counts I and II), will allow Defendant's motion for summary judgment on the state civil rights claim (Count III) and the conversion claim (Count IV) and will deny both parties' motions for summary judgment on the trespass claim (Count V).  The clerk will set the case for a status conference to address possible further proceedings regarding the trespass claim and attorneys' fees.

## II. BACKGROUND[1]

### A.  The Land

The city of Westfield, Massachusetts, held local elections on November 8, 2011.  At stake, among other positions, were seven at-large seats on the City Council and a seat on the Municipal Light Board.  City Councilors John Beltrandi and Plaintiff David Flaherty were two of eleven candidates seeking election to the Council.  Plaintiff Jane Wensley and Jack Callahan vied to represent Ward 3 on the Municipal Light Board.  As noted above, at the time of the election Defendant Daniel Knapik was the Mayor of Westfield.

In November 2011, Plaintiff David Costa had just purchased property located at 38 East Silver Street. Abutting his property to the east was 133 Lindbergh Boulevard, owned by the Atwater family.  Both of these properties sat on the north side of East Silver Street between Cross Street and Lindbergh Boulevard.  Nearby, on the south side of the street, was the home of Defendant

---

[1] Unless otherwise noted, the facts are drawn from Defendant's Statement of Material Facts (Dkt. No. 21), and Plaintiffs' Statement of Material Facts, (Dkt. No. 36), Plaintiffs' Response to Def's Statement of Material Facts, (Dkt. No. 40), and Defendant's Response to Plaintiffs' Statement of Material Facts, (Dkt. No. 50).

Knapik, at 43 East Silver Street, positioned diagonally from and within direct sight of Plaintiff Costa's and the Atwaters' properties.

The deed to Plaintiff Costa's property, as recorded in the Hampden County Registry of Deeds, reflected lot lines measuring 148.9 feet by 100 feet.  The city's Geographic Information System (GIS) viewer indicated that the lot extended from the house in a southern direction and ended shortly before the northern edge of the roadway.

Plaintiffs rely on this deed to contend that the tree belt, the land between the street and the sidewalk, was their private property.  The deed, they point out, fails to indicate that any entity, including the city, owned an easement or right of way on, or to, the tree belt area.  At worst, they contend, the tree belt was private land with a public right of way.

Defendant, relying on a survey completed by Land Surveyor Donald Frydryk, argues that the City of Westfield was the owner of this space, and the tree belt was public property.  Defendant also relies on DPW Director James Mulvenna's and DPW Foreman David Curran's depositions, where

-5-

they described the tree belt as city property.

B.   The Signs

As election day 2011 approached, campaign signs
inevitably appeared around town.  Prior to November 7, Ward
4 City Councilor Mary O'Connell obtained permission to place
one of Plaintiff Wensley's signs on the Atwater's property
at 133 Lindbergh Boulevard.  Plaintiff Costa gave permission
to City Councilor John Beltrandi to place his signs on
Costa's property at 38 East Silver Street.  After learning
about this location, and its proximity to a polling place,
Plaintiff Flaherty asked Beltrandi to obtain permission on
his behalf to place signs on the Costa property as well.
On November 7, Beltrandi informed Plaintiff Flaherty that
Plaintiff Costa had given the requested permission.  On the
same day, Ms. O'Connell also informed Plaintiff Flaherty
that she had obtained permission on his behalf to put signs
on the abutting property owned by the Atwaters at 133
Lindbergh Boulevard.

Having received a green light from the property owners,
Plaintiff Flaherty positioned four signs on the Atwater and
Costa properties.  He stationed his signs next to

-6-

Beltrandi's, creating a "line of signs" on the tree belt.
Both parties rely on a photograph taken by <u>Westfield News</u>
photographer Fred Gore as a depiction of the location of the
signs.  Notably, one of Plaintiff Flaherty's signs was
placed near a commercial sign offering a real estate
advertisement on Plaintiff Costa's property.

C.   <u>The Removal Order</u>

        Defendant Knapik observed Plaintiff Flaherty's signs
roughly twenty minutes after they were installed.  He
immediately called DPW Director Mulvenna twice and ordered
the removal of the political signs.  As Mulvenna explained,
"[H]e requested that I send someone down to the corner of
East Silver Street and Cross Street to remove some political
lawn signs that he determined were blocking the vision of
people coming in and out of that particular street."
(Mulvenna Dep. 35.)  All of the witnesses with first- or
second-hand knowledge of the order, including Defendant
Knapik, agree that the order was directed toward political
signs only, and toward a specific geographic location -- the
north side of East Silver Street between Cross Street and

-7-

Lindbergh Street.  Knapik and Mulvenna did not discuss any alternatives to outright removal of the political signs.

In response to the order, Mulvenna used his two-way radio to pass the direction to DPW Foreman David Curran to remove the signs.  Curran filled out a work order and sent two DPW workers to complete the task.  Fred Gore, a photographer for Westfield News, overheard the directive over the radio and went to the location, where he photographed the workers removing the political signs.  His photograph was later published in the Westfield News.

Following the removal of the signs, Plaintiff Flaherty happened to be in the area and noticed their absence.  City Councillor candidate Mary O'Connell went to the police station where she learned that they had not received any complaints about the signs.  Plaintiff Flaherty learned from Westfield Building Inspector Jonathan Flagg that his department had also not received any complaints.  Beltrandi asked Defendant Knapik if he knew what happened, to which Knapik allegedly responded, "[H]ow would I know, I just got home from work."  (Beltrandi Dep. 15.)  Beltrandi then inquired of Knapik's next-door neighbor, who revealed the

-8-

involvement of DPW Foreman Curran.  When asked, Curran
informed Beltrandi that Mulvenna had ordered the removal of
the signs, and Mulvenna, after allegedly claiming at first
that the police directed the action, disclosed Defendant
Knapik's involvement.  Plaintiff Flaherty replaced his signs
the same day, November 7, at the same location, and
Beltrandi received his signs back the morning of November 8.
After Plaintiff Flaherty replaced his signs, they were not
disturbed again.

     Prior to this incident, Defendant Knapik had never
before ordered the DPW to remove a campaign sign.  Further,
Mulvenna, who had worked for the DPW since 1999, was unaware
of any occasion where a campaign sign had been removed.
Instead, Mulvenna said it was the policy of the DPW to leave
the decision as to the placement of political signs to the
homeowner.  He further testified that, if he were concerned
about a sign's location, he would have been inclined to
"call the candidate and tell them[,] could you move your
sign a little more from the location where you put it."
(Mulvenna Dep. 53.)

D.   <u>Defendant's Motive</u>

-9-

With respect to the facts surrounding Mayor Knapik's motive in ordering the signs' removal, the parties vigorously dispute what inferences can be drawn. Plaintiffs believe that Defendant directed the removal of the signs because of a personal bias against Plaintiff Flaherty and a preference for Plaintiff Flaherty's, Beltrandi's, and Plaintiff Wensley's opponents.

It cannot be denied that, over time, Defendant Knapik and Plaintiff Flaherty appear to have had a number of documented personal and professional disputes.  Plaintiff Flaherty wrote articles that were published in the local papers that were critical of Defendant, and Plaintiff Flaherty allegedly sent an inappropriate e-mail to Defendant's wife.

According to Plaintiff, Defendant Knapik had referred to Plaintiff Flaherty as "councilor flap jaw" and "flapping jaw Flaherty," and Defendant's wife had described Plaintiff Flaherty and his supporters as "those less informed ignoramuses."  (Knapik Dep. 138.)  Defendant Knapik's property featured political signs supporting Jim Adams, one of the other candidates for city council, and Jack Callahan,

-10-

Plaintiff Wensley's opponent for the seat on the Municipal Light Board.

Defendant defends his actions as solely aimed at the protection of public safety.  At the end of October 2011, a severe and unusual snow storm hit Westfield hard.  Parts of the city were without electricity for ten days, and some were inaccessible due to fallen trees and debris.  Even Halloween was "rescheduled" to November 7 to allow time for recovery.

On November 6, Defendant Knapik received a Facebook e-mail from a constituent describing the "somewhat unsafe" conditions on Lindbergh Boulevard.  (Knapik Dep. 80.) Around noon on November 7, Defendant Knapik alleges he was personally inspecting Lindbergh Boulevard when he came across the signs.  After getting out of his car and surveying the area, he came to the conclusion that the signs blocked the sight lines at the entry point to the crosswalk. He therefore ordered their removal.  He specifically referred to Plaintiff Wensley's signs as being "clearly in the city right of way."  (Pikula Aff., Ex. 6.)

Plaintiffs allege harm arising from Defendant's conduct.  On election day, <u>Westfield News</u> ran the image of DPW workers removing the signs with a caption indicating that the signs had been "illegally placed."  Plaintiff Flaherty and Plaintiff Wensley contend that their reputations were harmed as a result.  Nonetheless, both successfully won re-election during the 2011 contest.

E.   <u>Statutory Background</u>

The city had a series of ordinances governing the placement of signs.  Temporary Signs pertaining to campaigns, sales, promotions, drives, or events of political, civic, philanthropic, educational, or religious organizations were permitted, provided such signs:

        a.   In Residential Districts
             (1) shall not exceed a size of six (6) square
        feet excluding incidental supporting frames or
        structures,
             (2) shall be within the lot line,
             (3) shall not be any higher (the top) than eight
         (8) feet from the ground,
              (4) shall not be illuminated or light emitting.

        b.   In all Business and Industrial Districts:
             (1) must comply with the requirements for signs in
        that district

        c.   In all Districts:

(1) signs that are different but substantially
equivalent for the candidate/cause/event shall be
considered the same sign,
          (2) shall not contain moving elements,
          (3) shall not be displayed more than two (2) months
     prior to the event,
          (4) shall not be displayed more than four (4)
months in any calendar year,
          (5) shall be taken down within five (5) days
following the event date,
          (6) shall not be located in an area or manner that
     would prevent the driver of a motor vehicle from having
     a clear and unobstructed view of official traffic
control signs and approaching or merging traffic,
          (7) shall not be posted on public property[.]


Westfield Code of Ordinances, Article VIII, § 8-10. 3(3).

     Article VIII, § 8-10 restrictions related "to sign

size, location, general type, and number of signs permitted

in each separate zoning district within the City of

Westfield."  It is undisputed that the officer charged with

enforcing the sign ordinance was the Superintendent of

Buildings.  The City also required that a permit be acquired

to place a fixture on a public way:

     No person shall place, erect or cause to be placed
     or erected within or over any sidewalk, street,
     highway or any way used by the public any fixture,
     banner, sign or structure unless a permit, issued by
     the board of public works, in the case of city ways,
     or by the commonwealth department of public works,
     in the case of state highways, authorizing such

-13-

placing or erection has been granted, and is in
effect.

Westfield Code of Ordinances, Part II, § 16-5.

Finally, the City regulated tag sales, which required a
permit.  If a sale were permitted, then the sale could be
advertised with signs at the permitted address or "on the
tree belt adjacent to a public way."  Westfield Code of
Ordinances, Part II, § 9-14.

F.   Litigation

As noted above, Plaintiffs have brought five claims.
The first claim asserts a violation of the First Amendment
of the United States Constitution pursuant to 42 U.S.C. §
1983.  The second and third claims are offered under the
Massachusetts Declaration of Rights, Part I, Article 16, and
the state civil rights statute, Mass. Gen. Laws ch. 12, §
11I.  Plaintiffs also contend that Defendant is liable for
trespass and conversion.

III.   DISCUSSION

Summary judgment is appropriate when there is no
genuine issue of material fact and the movant is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56.  The facts
and all reasonable inferences that might be drawn from them

-14-

are viewed in the light most favorable to the non-moving party.  Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004).  When addressing cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alder Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)(citation omitted).

A.  Civil Rights Claims

     Plaintiffs assert three counts against Defendant for violating their right to freedom of expression.  They offer a federal First Amendment claim under 42 U.S.C. § 1983, and two state law claims, one under the Massachusetts Declaration of Rights ("Mass. Decl. of Rights"), Part I, Art. 16, and the other pursuant to the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I.  Because the analysis differs slightly between the constitutional contentions and the state statutory claim, the court will address each independently.

     1.  42 U.S.C. § 1983 and Mass. Decl. of Rights, Part I,Art. 16

To succeed on a claim under § 1983, a plaintiff must establish two elements.  "First, the challenged conduct must be attributable to a person acting under color of state law . . . .  Second, the conduct must have worked a denial of rights secured by the constitution or by federal law."  Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997)(citation omitted).  Moreover, the law "requires the plaintiff to prove not only a deprivation of federal right, but also that the defendant's conduct was a cause in fact of the alleged deprivation."  Soto, 103 F.3d at 1062 (citation omitted).

The first requirement, specifying acts under the "color of state law," is undisputably satisfied in this case, as both parties agree that Defendant was acting in his capacity as Mayor.

The analysis centers on the second factor: whether the undisputed facts confirm that Defendant violated Plaintiffs' rights.  No question exists that the First Amendment's freedom of expression constitutes a right protected under § 1983.  See e.g., Connick v. Myers, 461 U.S. 138 (1983).  Here, Plaintiffs' First Amendment contentions concentrate on Defendant's decision to remove political signs from

Plaintiff Costa's and the Atwaters' property.  To succeed,
Plaintiffs can utilize one of two theories.  First, they can
show that Defendant acted intentionally and violated their
rights because he disagreed with the message of the signs,
i.e., that he perpetrated viewpoint discrimination.
Alternatively, Plaintiffs can show that the effect of
Defendant's action, regardless of his intent, was to favor
one category of speech over another, i.e., that the removal
of the signs constituted content-based discrimination.

The Mass. Decl. of Rights is generally coextensive
with the federal constitution when it comes to the freedom
of expression, and thus a breach of the latter constitutes a
breach of the former.  See, In Re Opinion of the Justices to
the Senate, 430 Mass. 1205 (2000); Walker v. Georgetown
Hous. Auth., 424 Mass. 671 (1997).  Where the two depart,
the state actually provides more extensive freedom of
expression protections than its federal counterpart.  See
e.g., Mendoza v. Licensing Bd. of Fall River, 444 Mass. 188
(2005); Batchelder v. Allied Stores Int'l,Inc., 388 Mass. 83
(1983).  The analysis respecting the second prong of § 1983,
is therefore also applicable in determining whether

Defendant infringed upon Plaintiffs' state constitutional right.

Plaintiffs conceded at oral argument that they cannot prevail on a claim of viewpoint discrimination at this stage of the case, since the question of Defendant's motive is contested and is therefore reserved for a jury. As a result, they rely at this summary judgment stage on a theory of content-based discrimination.

A First Amendment analysis under a theory of content-based discrimination proceeds in several steps. The court must first begin with an evaluation of the nature of the property at issue. Here, the court will assume, solely for purposes of this motion, that the location where the signs were placed was public property. This may, or may not, in fact be true; the issue is hotly disputed. If the land were private, however, Plaintiff would unquestionably be entitled to summary judgment on his claim for content-based discrimination, for the reasons discussed in more detail below. To avoid the disputed issue, the court will assume, favorably to Defendant Knapik, that the location of the signs was on public land.

Having assumed for purposes of these motions that the tree belt area where the signs were placed was public land, the court must then determine whether the land in question was a public forum and whether so called "strict scrutiny" applies when evaluating Defendant's actions.

Ultimately, the undisputed evidence illustrates that the land was a public forum, Defendant's action did constitute a content-based restriction on free expression, and the removal of the signs was not narrowly tailored to meet a compelling government interest.  The inevitable conclusion emerging from this chain of logic is that Defendant violated Plaintiffs' rights both under the United State Constitution and the Mass. Decl. of Rights.

> a.   <u>Forum Analysis</u>.

The Supreme Court has clearly established that the government does not have the unlimited power to restrict speech even on its own property.  Instead, the standard applied to a specific restriction shifts depending on the nature of the forum.  <u>See</u> <u>Pleasant Grove City, Utah v. Summum</u>, 555 U.S. 460 (2009); <u>Int'l Soc. for Krishna Consciousness,Inc. v. Lee</u>, 505 U.S. 672 (1992); <u>Cornelius v.</u>

NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788 (1985);

Perry Ed. Ass'n. v. Perry Local Educators' Ass'n., 460 U.S.

37 (1983).  Government property can be characterized as a

"traditional public forum," a "designated public forum," or

a "limited or nonpublic forum."

A "traditional public forum" is one "that has been

traditionally open to the public for expressive activity."

U.S. v. Kokinda, 497 U.S. 720, 726 (1990).  Traditional

public forums include: public streets or rights of ways,

Kunz v. People of State of NY, 340 U.S. 290 (1951); Wright

v. Town of Southbridge, No. 07-40305-FDS, 2009 WL 415506 (D.

Mass. Jan 15, 2009); sidewalks, Madsen v. Women's Health

Ctr., Inc., 512 U.S. 753 (1994); Boos v. Barry, 485 U.S. 312

(1988); public parks, Berger v. City of Seattle, 569 F.3d

1029 (9th Cir. 2009); and certain government buildings.  Cox

v. State of La., 379 U.S. 536 (1965).  These forums have

historically been open to public access and have served as a

consistent and continuous venue for citizens to freely

express their ideas.  While some regulation of speech is

permissible in limited situations, the government is

significantly more restricted in how it can act with respect
to these locations.

Government property that is not traditionally open to
speech, may still be considered a public forum where the
government has "expressly dedicated" the land to speech.
Kokinda, 497 U.S. at 726.  In such cases, the crucial
inquiry is whether the government affirmatively intended to
create a public space where individuals could exercise their
First Amendment rights.  Ridley v. Mass. Bay Transp. Auth.,
390 F. 3d 65, 76 (1st Cir. 2004).  To make this
determination, "courts must consider both explicit
expressions about intent and 'the policy and practice of the
government to ascertain whether it intended to designate a
place not traditionally open to assembly and debate as a
public forum.'"  Id., citing Cornelius, 473 U.S. at 802.  A
prototypical example of a designated public forum is a
public library.  Lu v. Hulme, No. 12-11117-MLW, 2013 WL
1331028, *5 (D. Mass. March 30, 2013).

Finally, government property that has not been
traditionally open to the public, nor dedicated to speech,
is a "limited or nonpublic forum."  Kokinda, 497 U.S. at

-21-

726-27.  These locations include: a televised debate for
candidates for political office, <u>Arkansas Educ. Television
Comm'n v. Forbes</u>, 523 U.S. 666 (1998); the military academy
at West Point, <u>Sussman v. Crawford</u>, 488 F.3d 136 (2nd Cir.
2007); and sidewalks immediately in front of a post-office.
<u>Del Gallo v. Parent</u>, 545 F. Supp. 2d 162, 177 (D. Mass.
2008), <u>aff'd in part</u>, 557 F.3d 58 (1st Cir. 2009).  The
government has more latitude to regulate private speech on
these properties.  When speech is permitted on these lands,
it is generally only open to certain groups discussing
specified topics.  <u>Summum</u>, 555 U.S. at 470.  Notably, the
government generally invokes some practical consideration to
justify the limitations placed on speech at these locations.

    The appropriate classification of government property
hinges on a number of considerations.  These include:

> (1) 'the nature of the property and its past uses,' <u>N.
> England Reg'l Council of Carpenters v. Kinton</u>, 284 F. 3d
> 9, 22 (1st Cir. 2002)(citation omitted); (2) 'whether
> expressive activity would tend to interfere in a
> significant way with the uses to which the government
> has as a factual matter dedicated the property,' <u>Lee</u>,
> 505 U.S. at 699 (Kennedy, J., concurring); (3) whether
> the property provides a reasonable person with any
> indication that she has 'entered some special type of
> enclave,' <u>U.S. v. Grace</u>, 461 U.S. 171, 180 (1983); (4)
> whether the property serves as a 'public passageway' or
> 'thoroughfare,' <u>Kokinda</u>, 497 U.S. at 727 (plurality

opinion); and (5) the extent to which the property's 'primary use' depends upon 'public access,' <u>Kinton</u>, 284 F.3d at 22.

<u>Del Gallo</u>, 545 F. Supp. 2d at 177.

Defendant relies heavily on <u>Members of City Council of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. 789 (1984), to argue that the land here is a "limited or non-public" forum subject solely to a reasonableness analysis.[2]  In <u>Vincent</u>, the plaintiffs attempted to place political signs on a utility pole but were prohibited from doing so because of local law.  <u>Vincent</u>, 466 U.S. at 791-94.  The local ordinance barred the posting of <u>any</u> sign on specified public property.  <u>Id.</u>  The plaintiffs facially challenged the ordinance as unconstitutionally over-broad and also argued that the pole was a traditional public forum.

In addition to finding the law facially constitutional, the Supreme Court rejected the plaintiffs' forum argument. The plaintiffs were unable to "demonstrate the existence of

_____

[2] In a limited or nonpublic forum, a restriction need only be viewpoint neutral and reasonable.  <u>See</u> <u>Pleasant Summum</u>, 555 U.S. at 470.  If this standard applied, summary judgment for either party would be inappropriate as the reasonableness of Defendant's action, along with his motive, would be questions for the jury.

-23-

a traditional right of access respecting such items as
utility poles for purposes of their communication comparable
to that recognized for public streets and parks."  Id. at
814 (internal citations omitted).  Critically though, the
Court added, "[T]he existence of a right of access to public
property and the standard by which limitations upon such a
right must be evaluated differ depending on the character of
the property at issue."[3]  Id.

    The problem with Defendant's reliance on Vincent is
that the tree belt area where Plaintiffs' signs were placed
resembles a public street or sidewalk far more than it does
a utility pole.  A brief analysis of the relevant factors
makes this obvious.

    First, the tree belt is precisely the type of land that
has traditionally been open to some form of speech.
Considering a tree belt abstractly -- removed from the facts
of this litigation -- suggests that the land is really no
different than the sidewalk or streets next to it.

_____

[3] Although the actual ordinance upheld in Vincent included
more than just utility poles, the Court's forum analysis
was largely predicated on the poles.  Vincent, 466 U.S. at
813-15 (focusing on "sign posts" in the forum analysis).

-24-

Public streets and sidewalks are generally "considered
. . . to be public forums." Grace, 461 U.S. at 177
(internal quotation and citations omitted).  They are
publicly owned areas where individuals have the right to
traverse, speak freely, protest, and assemble.  This remains
true where the sidewalk or street is located in a
residential neighborhood.  See Frisby v. Schultz, 487 U.S.
474, 480 (1988)("Our prior holdings make clear that a public
street does not lose its status as a traditional public
forum simply because it runs through a residential
neighborhood."); Carey v. Brown, 447 U.S. 455 (1980)(finding
public streets and sidewalks in a residential neighborhood
are public forums.)

Since the tree belts at issue here literally lay
between the street and the sidewalk, and shared the same
characteristics, it makes little sense to differentiate
between them.  Indeed, it would be anomalous to pretend that
a tree belt is a non-public forum, but the street and
sidewalk sandwiching it are public.

Significantly, tree belt areas have consistently been
employed in Westfield to express speech.  The record

-25-

demonstrates that residents have historically and
continuously placed political signs on the tree belt in
front of their residences. See, e.g., (Mulvena Dep.
30)("[I]t's normal to have campaign signs out there.");
(Mulvena Dep. 52)(acknowledging that a candidate could put a
sign on the tree belt with written permission from a
homeowner); (Curran Dep. 12-13)(noting that campaign lawn
signs were "prevalent throughout the city").  A history of
expression employing the tree belt in this manner suggests
that the land is a public forum.

     The fact that the city may, to some extent, regulate
the placement of signs on the tree belt does not affect the
land's status as a public forum.  Westfield cannot
extinguish the right to free expression in particular areas
simply by passing a regulation, where the nature of the
property and its past use confirm that it is a public forum.

     Plaintiffs' position is bolstered by the fact that
their use of the tree belt did not interfere with any
government use of the land.  This is clearly not a case like
Greer v. Spock, 424 U.S. 828 (1976), where the Court found
that a military base was not a public forum.  There, the

-26-

Court found that opening that land to free expression, including political speech, would significantly interfere with the government's goal of national defense.

Aside from a perfunctory reference to using the "tree belt" for the public's health and safety, such as collecting debris, Defendant fails to explain how free expression would interfere with a legitimate use of the land.  It is, moreover, difficult to conceive of any use that could interfere with a governmental interest.  Even assuming that the land is used for storing debris pending pick up, the existence of signs in no way disrupts that purpose.

Indeed, the city's ordinance permitting tag sale signs on the land undercuts any claim that speech interferes with the government's use of the property.  Through the ordinance, the city implicitly acknowledges that speech <u>can</u> occur on this property.  It is simply not possible to argue that a tag sale does not interfere with the land's use, but political signs somehow would.

It also cannot be argued that the tree belt area served as any sort of special government enclave where speech may be restricted.  In <u>Grace</u>, 461 U.S. at 171, the Supreme Court

was asked to determine whether the sidewalk outside of its building constituted a public forum.  The Court emphasized that "there is no separation, no fence, and no indication whatever" that would inform an individual that he or she has moved from the street or sidewalk into a private, government zone.  <u>Grace</u>, 461 U.S. at 180.  For that reason, among others, the Court concluded that the sidewalk in front of the Supreme Court was a public forum.

Similarly, no reasonable person stepping onto a tree belt in a residential neighborhood would conclude that this constituted an incursion onto a special government enclave where free speech was prohibited.  More likely, the individual would conclude that he or she was on private property.  The fact that the tree belt essentially blends in with the sidewalk and street further amplifies its public nature.

The final two factors typically applied in a forum analysis, whether the property serves as a public passageway and the extent to which its primary use depends upon public access, do not significantly support either Plaintiffs or Defendant.  For instance, whether the land is a throughway

-28-

only slightly favors the finding of the land as a public
forum.  Although parties may cross through the tree belt on
occasion, it is not, as a matter of common sense, likely to
be used as regularly as a street or sidewalk.  At the same
time, it does serve as a gateway between the two, and
therefore <u>could</u> be used in that manner.

The other remaining factor is also neutral.  Public
access neither inhibits nor necessarily promotes the primary
purpose of the land.

The outcome of this somewhat labored analysis is
straightforward: the tree belt in question fits comfortably
into the "public forum" category.  At a minimum, it is a far
cry from those lands labeled "limited" or "nonpublic"
forums.  Ultimately, the land where the signs were placed
was not significantly different from the public sidewalk or
street it abutted.

      b.  <u>Strict Scrutiny and Defendant's Actions.</u>

Given the nature of the property, Defendant bears an
especially heavy burden to justify any content-based
restriction on free expression.  "In a traditional or
designated public forum, content-neutral restrictions on the

time, place, and manner of expression must be narrowly
tailored to serve some substantial government interest, and
must leave open adequate alternative channels of
communication." <u>Kinton</u> 284 F.3d at 20, <u>citing</u> <u>Perry</u>, 460
U.S. at 45-46.  In the context of political speech, this
scrutiny is even more exacting.  <u>See</u> <u>Citizens United v. Fed.</u>
<u>Election Comm'n</u>, 558 U.S. 310 (2010).  "The First Amendment
has its fullest and most urgent application to speech
uttered during a campaign for political office," and
"political speech must prevail against laws that would
suppress it, whether by design or inadvertence."  <u>Id.</u> at
339-40 (citations omitted).

Defendant's order to remove the political signs fails
this test.  Defendant's action was impermissibly content-
based and is thus subject to strict scrutiny.  Under that
standard, Defendant's conduct was impermissible because it
was not narrowly tailored to serve any compelling government
interest.

The crucial inquiry with respect to content-neutrality
is whether the government, through its regulation, has
preferred one message over another.  <u>See</u> <u>Ward v. Rock</u>

-30-

Against Racism, 491 U.S. 781 (1989).  The analysis hinges on
whether the regulation targets specific content, and "[a]
regulation that serves purposes unrelated to the content of
expression is deemed neutral, even if it has an incidental
effect on some speakers or messages but not others."  Id. at
791 (citation omitted).  In other words, if a regulation
only targets certain content, there must be a neutral
justification for the distinction.  See City of Cincinnati
v. Discovery Network, Inc., 507 U.S. 410, 429-30 (1993).

        One incarnation of such an impermissible content-based
restriction is where the government permits commercial
speech, but prohibits political expression.  The First
Circuit's decision in Matthews v. Town of Needham provides
guidance.  764 F.2d 58 (1st Cir. 1985).  In Matthews, the
Town of Needham enacted an ordinance prohibiting political
signs on residential property.  However, commercial signs,
like those denoting a name of a building, relating to a sale
or lease of a property, or temporarily planned for
charitable purposes, were exempt from the regulation.  Id.
at 59.  The Court of Appeals held that this regulation was
facially unconstitutional as it permitted commercial speech

while explicitly precluding political speech.  Id. at 61
("By giving more protection to commercial than to
noncommercial speech, the bylaw inverts a well-established
constitutional principle.").

In reaching its conclusion, the First Circuit
distinguished Vincent, a case the defendants there, as here,
heavily relied on.  Id. at 61.  The court differentiated a
restriction on all speech, as in Vincent, and a restriction
on some speech.  Id.  Crucially, in Matthews, only political
speech was proscribed.

Matthews made clear that, in a forum where content-
based regulations are discouraged, a blanket prohibition
restricting all content may be more easily justified than
one that targets only political expression.  Cf. Discovery
Network, 507 U.S. at 429 ("Regardless of the mens rea of the
city, it has enacted a sweeping ban on the use of newsracks
that distribute 'commercial handbills,' but not
'newspapers.' Under the city's newsrack policy, whether any
particular newsrack falls within the ban is determined by
the content of the publication resting inside that
newsrack.")

The undisputed facts illustrate the content-driven nature of Defendant's action.  Most significantly, it is undisputed that Defendant only ordered the removal of political signs.  (Knapik Dep. 93)("I said the signs are Beltrandi, Flaherty and Wensley on the right of way."); (Hewitt Dep. 11-12)("He said go by some house and pick up some voting signs . . . He told us voting signs."); (Mulvenna Dep. 35)("He requested that I would send someone down to the corner of East Silver Street and Cross Street to remove some political lawn signs.").

Defendant made this decision with knowledge that a commercial, real estate sign was located at that exact location.  (Knapik Dep. 84)("The first thing I saw was a Dave Flaherty sign that was positioned underneath the realtor sign in such a way that the realtor sign on the corner hung down and his sign was directly placed underneath it.").

Whether any sign was removed was therefore contingent on the content of the signs.  While Defendant's proffered safety concerns may provide a justification for moving signs generally, no explanation plausibly justifies removal only

-33-

of the political ones.  Defendant therefore infringed upon political speech while permitting the commercial content to remain, an act clearly barred by all applicable precedents.

Although Defendant's order requires an extraordinarily micro-level analysis -- one decision by a single person -- the broad principle espoused in Matthews is still applicable.  This alone is sufficient to subject the decision to strict scrutiny.

To satisfy strict scrutiny, the Defendant must show that his restriction of free expression through the removal of the signs was narrowly tailored to serve a compelling government interest.  Kinton 284 F.3d at 20.  Content-based restrictions are presumptively unconstitutional, and rarely survive strict scrutiny to "provide maximum assurance that the government will not throw its weight on the scales of free expression, thereby 'manipulat[ing] . . . public debate through coercion rather than persuasion."  McGuire v. Reilly, 260 F.3d 36, 43(1st Cir. 2001), quoting Turner Broad. Sys. Inc. v. FCC, 512 U.S. 622, 641 (1994).

Defendant insists that he had a compelling interest -- public safety -- and his action was narrowly tailored to

rectify an obstruction to drivers.  He points out that he only took political signs from <u>one</u> location, despite their presence throughout the town.  This argument however cannot survive the probing analysis required under the strict scrutiny standard.

A narrowly tailored restriction is one that does not burden substantially more speech than necessary to further the government's compelling interest and that leaves open alternative channels of communication.  <u>Ward</u>, 491 U.S. at 799.  Although such a restriction need not be the least discriminatory alternative available, it can only burden speech tied to the stated ends.  <u>Id.</u>  In other words, it must target "the exact source of the evil it seeks to remedy."  <u>Coutermanche v. Gen. Serv. Admin.</u>, 172 F. Supp. 2d 251, 271 (D. Mass. 2001), <u>quoting</u> <u>Edwards v. City of Coeur d'Alene</u>, 262 F.3d 856, 863 (9th Cir. 2001)(further citations omitted).  A court's job at this stage of the analysis is to examine the "fit" between the action and the alleged interest.  <u>Discovery Network</u>, 507 U.S. at 416.

As repeatedly noted, Defendant's "safety" justification for his order to remove the signs collapses in the face of

-35-

the undisputed fact that he ordered the removal of <u>all</u> of
the political signs, and only the political signs, at the
relevant properties.  Crucially, however, he allowed
Plaintiff Flaherty's signs to be placed in an identical
position on the very same day.  If <u>every</u> political sign
posed a safety concern, then certainly Plaintiff Flaherty's
signs should have been removed after they were replaced.

     Defendant's decision was particularly egregious, since
no speech actually needed to be restricted at all.  As DPW
Director Mulvenna testified, his inclination would have been
to "call the candidate and tell them[,] could you move your
sign a little more from the location where you put it."
(Mulvenna Dep. 53.)  He knew of no other incidents where
campaign signs were removed in this manner.  (<u>Id.</u>)  Though
the existence of this less-restrictive alternative is not
dispositive, it still helps reveal the over breadth of
Defendant's restriction.  <u>See</u> <u>Discovery Network</u>, 507 U.S. at
417 n.13 ("[I]f there are numerous and obvious less-
burdensome alternatives to the restriction on commercial
speech, that is certainly a relevant consideration in

determining whether the "fit" between ends and means is reasonable.")

      c. <u>Qualified Immunity</u>

Defendant argues that, even if his actions did violate Plaintiffs' rights to free expression, he is entitled to the protection of the doctrine of qualified immunity. Qualified immunity attaches where a government official's action does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In the First Circuit, to determine whether a particular defendant is protected by this doctrine, courts ask three questions:

> (I) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right.

<u>Limone v. Condon</u>, 372 F.3d 39, 44 (1st Cir. 2004)(citation omitted).

Defendant focuses on the second and third part of the test, as he argues that the law was <u>not</u> clear at the time of his decision, and a reasonable person would not have

-37-

considered the act likely to violate another's
constitutional right.  He contends that he was relying on
the city's sign ordinances and the <u>Vincent</u> case to justify
his order.

 Defendant's argument is not persuasive.  At step one,
the analysis exhaustively detailed above demonstrates
clearly that a constitutional violation <u>did</u> occur.  As to
the second question, the constitutional protection at issue
here -- the freedom to post political signs consistent with
constitutional regulations -- is well established.

The analysis thus hinges on the third prong: whether,
given the city's ordinances and the <u>Vincent</u> case, a
reasonable person in Defendant's shoes would have understood
that the removal order would likely violate another's
constitutional rights.  Several undisputed facts show that a
reasonable person, in Defendant's position, was obliged to
consider the legal implications of his decision and to be
aware that the removal order did in fact constitute a
violation of Defendants' rights to free expression.

Most critically, this was a novel order; neither
Defendant, nor apparently any prior municipal official, had

-38-

ever ordered the removal of political signs before.  (Knapik Dep. 114-15.)  Director Mulvenna, employed with the DPW since 1999, confirmed the unprecedented nature of this order.  (Mulvenna Dep. 53.)  Nothing in the record suggests that Defendant even considered alternative, less restrictive measures.  (Dkt. No. 50 at 16.)  Significantly, the Mayor normally exercised no direct authority in enforcing the sign ordinances.  The decision was hasty, unprecedented, and outside his normal ambit of responsibility.  See Art. II, Westfield Municipal Ordinances, Sec. 6-35(1).

On the undisputed facts of record, the court is obliged to find that a reasonable person should have known that the order to remove the political signs did infringe upon the guarantees of free expression set forth in the United States Constitution and the Massachusetts Declaration of Rights. Moreover, in failing even to consider alternatives to outright removal, (Dkt. No. 50 at 16), Defendant demonstrated indifference to what he should have known were Plaintiffs' rights.  Under these circumstances, Defendant is not entitled to protection under the doctrine of qualified immunity.

Since no genuine dispute respecting the violation of Plaintiffs' federal and state constitutional claims exists, Plaintiffs are entitled to summary judgment on Count I and Count II of their complaint.

2. MCRA Claim

To succeed on a claim under Mass. Gen. Laws ch. 12, § 11I, a plaintiff must prove "(1) their exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth; (2) have been interfered with, or attempted to be interfered with; and (3) that the interference or attempted interference was by "threats, intimidation or coercion. "  Seanset Dev. Co. v. City of Taunton, 423 Mass. 395 (Mass. 1996)(citation omitted). Although the MCRA is generally consistent with § 1983, it departs in one critical respect -- the third requirement. Batchelder v. Allied Stores Corp., 393 Mass. 819, 822,23 (1985).

As discussed in the context of the § 1983 claim, Plaintiffs' federal constitutional rights were violated, and since the Commonwealth provides the same protections, the state constitutional rights were also infringed upon.

Plaintiffs' problem arises when turning to the third element.  No evidence in this record supports Plaintiffs' assertion that Defendant's action was done through any threat, intimidation, or coercion.

Viewed in the light most favorable to Plaintiffs, Defendant's deliberate action certainly violated Plaintiffs' rights to free expression and, for a short time, disrupted their political campaigns.  With equal clarity, however, the record fails to establish that Defendant acted through threats, coercion, or intimidation.  No evidence in this record shows, for example, that Defendant attempted to exert pressure on Plaintiffs or that Defendant attempted to put Plaintiffs in fear to compel or deter conduct.  See Anderson v. Boston School Committee, 105 F.3d 762 (1st Cir. 1997).

As a result, Plaintiffs cannot succeed on their MCRA claim, and summary judgment for Defendant is appropriate on Count III.

B.  Common-law Claims

1.  Conversion

Plaintiff also alleges two common-law claims.  The first, conversion, requires that

-41-

(1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest at the time of the alleged conversion; (3) the plaintiff was damaged by the conversion and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993).  A plaintiff is normally limited in his or her recovery to the "fair and reasonable market value of the property with interest from the time of conversion," but "where there is evidence of special injury, such as interruption of a business, further damages may be awarded."  Manhattan Clothing Co. v. Goldberg, 322 Mass. 472, 475-76 (1948)(citations omitted); see also Food Specialties, Inc. v. John C. Dowd, Inc., 339 Mass. 735, 748 (1959)("Consequential damages, including loss of use during any period of detention, resulting from and caused by a conversion are recoverable in appropriate cases.")

Here, the first and second elements have been established: Defendant intentionally and wrongfully exercised control of Plaintiffs' property.  The question of

-42-

damages is murkier.  Certainly, Plaintiffs are not
contending harm to the actual chattel that was converted.
It is undisputed that they promptly received their signs
back with no significant damage.

Instead, they argue that the conversion foreseeably
harmed their political reputations.  Specifically, the
publication of the picture of the signs being removed, with
the caption that the signs were "illegally placed," harmed
their reputations.  (Dkt. No. 50 at 24.)

Two problems mar this rationale for damages.  First,
the cases where consequential damages are traditionally
awarded occur in the context of a business that has lost
income as a result of the conversion.  See, e.g., Goldberg,
322 Mass at 475-76.  No cited authority supports an award of
damages where only an alleged injury to reputation results
from a conversion.

The bigger problem is that Plaintiffs offer no specific
facts to support their claim of injury.  Instead, they
merely allege that their reputations were harmed in some
unspecified way.  Even if the law permitted recovery for
damage to their reputations based on conversion, which seems

-43-

unlikely, Plaintiffs fail to provide any evidence that their reputations were harmed in the manner they broadly assert.[4]

Because the record lacks sufficient facts to send this question to a jury, Defendant is entitled to summary judgment on Plaintiffs' conversion claim.

   2.   <u>Trespass</u>

Plaintiffs' second common-law claim is for trespass to Plaintiff Costa's property. Plaintiffs must show: (1) possession of the property, and (2) an intentional entry by, or caused by, a defendant. <u>Inhabitants of Barnstable v. Thacher</u>, 44 Mass. 239, 242 (1841). A plaintiff need not establish any damages, Restatement (Second) of Torts, § 163, but must show that there was intent and "an affirmative voluntary act upon the part of a wrongdoer." <u>Id.</u>

Evidence certainly confirms that Defendant acted intentionally -- <u>i.e.</u>, he knew he was ordering his subordinate to go onto the tree belt to remove the signs. However, while the court assumed the tree belt was publicly

_____

[4] Even if Plaintiffs had alleged specific harms, the evidence to demonstrate causation is also thin. Their primary argument is that their reputations were harmed by the image and caption in the newspaper not by the removal itself.

-44-

owned for purposes of Plaintiff's First Amendment claim, it
cannot do the same for this count.  The parties vigorously
dispute who owned the relevant piece of ground.  Plaintiff
Costa relies on his deed, while Defendant points to a survey
of the land and city ordinance which suggest it is public
property.  Moreover, even if the tree belt was technically
public property, Plaintiff Costa may still have had some
easement or right to possession.  Each litigant offers
compelling evidence, making this a genuine dispute of fact
reserved for a jury.

       As such, neither party is entitled to summary judgment
on the trespass claim.

## IV.  CONCLUSION

       It may seem that the court and the parties have
expended an extraordinary amount of time and energy over a
minor local tiff, involving the brief removal of a few
signs.  But the impulse to stifle expression may appear, at
first, in small ways.  An attempt to nibble around the edge
of a constitutional right demands exacting scrutiny and a
vigilant response if the liberties protected by the Bill of
Rights are to be preserved.

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 20) is DENIED as to Counts I, II and IV, and ALLOWED as to Counts III and V, and Plaintiffs' Motion for Summary Judgment (Dkt. No. 30) is ALLOWED as to Counts I and II, and DENIED as to Counts III, IV, and V.

The clerk will set the case for a status conference to discuss possible further proceedings on the claim for trespass, attorneys fees, and the wording of the declaratory judgment to issue on Counts I and II.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge